UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------X

SECURITIES INVESTOR PROTECTION
CORPORATION,

        Plaintiff,

                            16 Civ. 620 (RWS)0

  - against -

                               OPINION

GLOBAL ARENA CAPITAL CORP.,

        Defendant.

-------------------------------------------X

A P P E A R A N C E S:

        Attorneys for the Plaintiff

        SECURITIES INVESTOR PROTECTION CORPORATION
        1667 K Street, NW, Suite 1000
        Washington, DC 20006
        By:  Josephine Wang, Esq.
            Christopher H. LaRosa, Esq.
            Nathanael S. Kelley, Esq.

        Attorneys for the Defendant

        GUSRAE KAPLAN NUSBAUM PLLC
        120 Wall Street
        New York, NY 10005
        By:  Martin P. Russo, Esq.
            Martin H. Kaplan, Esq.



1

**Sweet, D.J.,**

The Securities Investor Protection Corporation ("SIPC" or
the "Plaintiff") has initiated an emergency proceeding seeking
the issuance of a protective decree against Global Arena Capital
Corporation ("Global Arena" or the "Defendant"), pursuant to 15
U.S.C. § 78eee(b)(1), part of the Securities Investor Protection
Act ("SIPA"). Based upon the findings of fact and conclusions
of law set forth below, the application for a protective decree
is granted.

## Prior Proceedings

SIPC initiated this action on January 28, 2016, with the
filing of its Complaint (Dkt. No. 1) and an Order to Show Cause
seeking imposition of a protective decree as a preliminary step
toward Global Arena's liquidation. The Order was signed later
that day, and a number of statutory stays imposed pursuant to 15
U.S.C. § 78eee(b)(2)(B). (Dkt. No. 4.) A conference was held
the following morning, at which the Defendants declared their
intent to oppose the protective decree.

After the parties submitted briefing (Dkt. Nos. 9 & 25),

2

the show cause hearing was held on Wednesday, February 3. SIPC presented 11 witnesses and 17 exhibits.[1] The Defendant called one witness. At the conclusion of the hearing, Global Arena requested the opportunity to file post-hearing briefs, which was granted. The Defendant submitted its post-hearing brief on Friday, February 5 (Dkt. No. 27) and SIPC submitted its brief in response on Monday, February 8, at which time the application was considered fully submitted. (Dkt. No. 28.)

## Findings of Fact

From May of 2008 to June of 2015, Global Arena operated in the securities industry as an "introducing broker-dealer." (See Declaraion of Ginger Corrao, Dkt. No. 15 (the "Corrao Dec."), Ex. G.) Unlike a traditional broker, who both offers investment advice to a client and executes trades on his or her behalf, an introducing broker only takes charge of the relationship with the client; the mechanics of the trade are handled by another party. The Farlex Financial Dictionary defines the role as:

---

[1] Two witnesses, Wayne Kuykendall and the aptly-named Robert M. Sweet (no relation), provided testimony via telephone from Alaska and Florida respectively, pursuant to Federal Rule of Civil Procedure 43(a).

3

A person or business that provides investing advice or counsel to an investor, but does not actually handle transactions. Generally speaking, introducing brokers make recommendations while delegating the task of executing trades to someone at the same or a different firm who operates on a trading floor. The introducing broker and the person(s) who execute a transaction split the fees and commissions according to some agreed upon arrangement.

Introducing Broker, Farlex Financial Dictionary (2009),

available at http://financial-

dictionary.thefreedictionary.com/Introducing+broker. In

the case of Global Arena, the clearing firm was RBC Capital

Markets, LLC ("RBC"). (Corrao Dec., Ex. G.) Although

clients would speak to Global Arena representatives and ask

them to conduct trades, the clients' cash and securities

were actually held by RBC, and it was RBC that would

actually execute each transaction. (Hearing Transcript,

Dkt. No. 27 Ex. 1 (the "Tr."), 82:12-24.) The clients'

statements and confirmations would come from RBC, not from

Global Arena. (See, e.g., Tr. 47:15-48:1.) Until June

2015, Global Arena was registered with the Securities and

Exchange Commission ("SEC") and a member of the Financial

Industry Regulatory Authority ("FINRA").

In late 2014 and early 2015, several Global Arena customers

noticed unauthorized trading in their accounts, generally by

4

receiving printed trade confirmations showing the purchase of securities that they had not ordered.  (See, e.g., Declaration of Gary Trovillion, Dkt. No. 22 Ex. 2 (the "Trovillion Dec."), at 1; Declaration of Ronald Primuth, Dkt. No. 22 Ex. 3 (the "Primuth Dec."), at 1.)  Although the Defendant elicited testimony on cross-examination indicating that there is no independent confirmation that the trading at issue was unauthorized (See, e.g., Tr. 104:11-18), the customers' testimony establishes that fact.  In addition to the six separate declarants produced by SIPC to testify regarding unauthorized trading activity in their accounts, an inference of fraudulent trading results from the fact that several of the same stocks, including Starbucks Corp., Community Choice Financial, and Clovis Oncology, appear in the accounts of multiple declarants.  Furthermore, Wendoly Velez, part of FINRA's investigative team, testified that she and other investigators conducted a sample review of Global Arena's phone records, to confirm that the company actually did not contact customers prior to placing the trades.  (Tr. 105:6-17.)

Global Arena has adduced no evidence to establish that the trades were authorized.  One of their former employees testified that it was Global Arena's practice to obtain a client's

5

approval prior to trading, and then to memorialize the approval on an order ticket. (Tr. 119:10-15.) No such tickets were produced for any of the disputed trades. No Global Arena representative testified that the trades at issue were authorized (or conducted by another party), nor did the company deny the allegations in its papers. Based on the significant number of declarants who asserted that unauthorized trading occurred in their accounts, the circumstantial evidence that corroborates their assertions, and Global Arena's failure to contest them on the facts, the testimony at the hearing establishes that the trades at issue were unauthorized and that Global Arena was responsible.

Global Arena's customers received written confirmations of each trade, including the unauthorized ones. (See, e.g., Tr. 30:21-31:3.) When customers called to complain, Global Arena would verbally offer to cancel the trades or settle the dispute, but did not ultimately do so. (See, e.g., Trovillion Dec. at 2; Primuth Dec. at 2-3.)

As a registered broker-dealer, Global Arena filed monthly Financial and Operational Uniform Combined Uniform Single ("FOCUS") reports, as required by SEC Rule 17a-5. (Corrao Dec. Ex. H.) These reports include totals of the firm's assets,

6

liabilities, and net capital as of the end of each month.  (See, e.g., Corrao Dec. Ex. I.) The FOCUS reports were filed through an online system named Web CRD, which was provided and operated by FINRA.  (Tr. 72:1-14.)

Global Arena filed its final FOCUS report on June 12, 2015, covering activity through May 31, 2015. (Corrao Dec. Ex. H.) That report showed the company's assets as $76,484 in cash, $639,302 in receivables from other brokers or dealers, and $784,000 in investment and receivables from affiliates and subsidiaries, for a total of $1,523,159 (though the category concerning affiliates and subsidiaries was deemed "non-allowable"). (Corrao Dec. Ex. I.)  The company's liability amounted to $163,540.  (Id.)  Ginger Corrao, a Principal Regulatory Coordinator with FINRA, testified that Global Arena was subject to a minimum net capital requirement of $50,000, but reported more than ten times that amount at the time of its last FOCUS report.  (Tr. 88:2-12.)

On June 5, 2015, Global Arena used FINRA's Web CRD system to file a Form BDW, requesting to withdraw its broker-dealer registration. (Corrao Dec. Ex. C.)  Item 5 of the Form BDW asks the withdrawing entity whether it owes any money or securities to customers or other broker-dealers; Global Arena answered no,

7

and noted that due to its relationship with RBC it had no client funds or securities. (Id.) Global Arena also admitted to being the subject of an investment-related investigation and a consumer-initiated complaint. (Id.) The company did not file any further reports after the Form BDW; nor did it ever file a FOCUS report covering the period between June 1 and June 5, 2015. (See Corrao Dec. Ex. H.)

Also in June of 2015, FINRA brought a proceeding against Global Arena, alleging that the corporation violated its rules by charging customers unfair prices and excessive markups on corporate bond transactions, and committed related supervisory violations. (Declaration of Gary Jackson, Dkt. No. 21, at 1-2. Global Arena did not contest the charges, and FINRA entered a decision permanently expelling Global Arena and ordering it to pay disgorgement and fines totaling $1.33 million. (Id. at 2-3.)

On July 30, 2015, the Alaska Department of Commerce, Community, and Economic Development issued a cease and desist order, finding that Global Arena and several of its employees had violated the Alaska Securities Act by cold-calling investors, selling unsuitable securities, and misrepresenting the risks associated with those securities. (SIPC Ex. 15.)

Global Arena was fined $150,000 for those violations. (Id. at 7.)

On January 16, 2015, the New York State Department of State issued a tax warrant for global Arena in the amount of $751.74. (SIPC Ex. 16.) There is no evidence that Global Arena has paid this tax warrant, its Alaska fine, its FINRA fine, or any amount of money offered to its customers in settlement. There is also no evidence showing what assets, if any, Global Arena still holds.

## Applicable Standard

When a debtor opposes the issuance of a protective decree, SIPC must establish one of the four factors laid out in 15 U.S.C. § 78eee(b)(1) in order for the decree to issue. Those factors are if the debtor

- (A) is insolvent within the meaning of section 101 of Title 11, or is unable to meet its obligations as they mature;

- (B) is the subject of a proceeding pending in any court or before any agency of the United States or any State in which a receiver, trustee, or liquidator for such debtor has been appointed;

- (C) is not in compliance with applicable requirements under the 1934 Act [15 U.S.C.A. § 78a et seq.] or

9

rules of the [Securities and Exchange] Commission
or any self-regulatory organization with respect to
financial responsibility or hypothecation of
customers' securities; or

(D) is unable to make such computations as may be
necessary to establish compliance with such
financial responsibility or hypothecation rules.

15 U.S.C. § 78eee(b)(1)(A-D). If the Court finds any of these
grounds for granting the application, it must appoint a trustee,
chosen by SIPC, to oversee the liquidation of the business.
SIPC v. Barbour, 421 U.S. 412, 417-18 (1975); SIPC v. BDO
Seidman, LLP, 222 F.3d 63, 67 (2d Cir. 2000).

## The Protective Decree is Granted

### 1. Global Arena is Subject to SIPA

Before reaching the 15 U.S.C. § 78eee(b)(1) factors, the
Court must consider a threshold matter - whether SIPA applies to
Global Arena at all. The company contends that because it is an
introducing broker-dealer, rather than a full-service broker
transacting trades on behalf of clients, its clients do not
qualify as "customers" subject to SIPA's protection. (See D.'s
Post-Hearing Br., Dkt. No. 27, at 10.) SIPA defines a customer

10

as any person who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of business. 15 U.S.C. § 78lll(2)(A). Since its clients' securities are in fact held by RBC, Global Arena argues that its work falls outside SIPA's scope.

The question appears to be an unsettled one in this district. SIPC cites several cases in which bankruptcy courts here have carried out the liquidation of introducing broker-dealers, e.g., In re Mason Hill & Co., Inc., No. 95-99999 2004 WL 2659579 (Bankr. S.D.N.Y. Oct. 18, 2004), but no Second Circuit or district court authority. Global Arena also does not cite any such authority, though it does cite to SEC v. SIPC, 872 F. Supp. 2d 1 (D.D.C. 2012), aff'd 758 F.3d 357 (D.C. Cir. 2014), a recent out-of-circuit decision rejecting the application of SIPA to an introducing broker-dealer. While SIPA "does protect claimants who attempt to invest through their brokerage firm but are defrauded by dishonest brokers," In re Bernard L. Madoff Sec. LLC, 654 F.3d 229, 236 (2d Cir. 2011) (quotation omitted), the Circuit has also declared that "the critical aspect of the 'customer' definition is the entrustment of cash or securities *to the broker dealer*." Id. (emphasis added).

11

However, SIPA's definition of "customer" also explicitly

includes "any person who has a claim against the debtor arising

out of sales or conversions of [] securities." 15 U.S.C. §

78lll(2)(B)(iii); see also In re Stratton Oakmont, Inc., No. 01

Civ. 2812, 2003 WL 22698876, at *3 (Bankr. S.D.N.Y. Nov. 14,

2003). The unauthorized trades that took place in customers'

accounts amounted to conversion by Global Arena, and therefore

entitled the account holders to protection under SIPA. See SEC

v. S.J. Salmon & Co., Inc., 375 F. Supp. 867 (S.D.N.Y. 1974);

see also Schultz v. Omni Mut. Inc., No. 93 Civ. 3700, 1993 WL

546671, at *3 (S.D.N.Y. Dec. 30, 1993). Because these acts of

conversion provide an independent basis for customer status, the

question of whether an introducing broker-dealer is subject to

SIPA may be set aside.

Global Arena contends that it cannot face consequences for

the unauthorized trading due to the doctrine of ratification,

arguing that its customers' failure to timely complain to the

holder of the account - RBC - is fatal to their claims. (D.'s

Post-Hearing Br., Dkt. No. 27, at 12.) Ratification is a

doctrine which "prohibits the customer from disavowing

unauthorized trading in his or her account when it is clear from

all services that the intent of the customer was to adopt as his

12

own and for all times the trades executed for his account without authorization." Richardson Greenshields Sec. Inc. v. Lau, 819 F. Supp. 1246, 1259 (S.D.N.Y. 1993). The burden is on the broker to show ratification, though if the broker can show that the customer was aware of the unauthorized trades, the customer has an obligation to show that his or her knowledge did not rise to the level of ratification. Id.

Global Arena's ratification defense fails on a factual level because the uncontradicted evidence shows that customers did complain to Global Arena (see, e.g., Trovillion Dec. at 2; Primuth Dec. at 2-3.) As an introducing broker-dealer - the entity in charge of interacting with clients — Global Arena was the logical entity for customers to register a complaint with. Global Arena cites no authority for the proposition that a complaint to an introducing broker-dealer is insufficient, and the Court is unaware of any. While Global Arena does cite to In re Klein, Maus & Shire Inc., 301 B.R. 408, 419 (Bankr. S.D.N.Y. 2003), for the proposition that "an investor's failure to object in writing on a timely basis absolves the broker from liability," that case is distinguishable because its holding is limited to situations in which customers' contracts contain a provision requiring complaints in writing. See id. ("For these

13

reasons, broker-customer agreements requiring written notice of objection within a limited amount of time after the customer receives confirmation of the transaction generally have been enforced by courts."); see also Modern Settings, Inc. v. Prudential-Bache Sec., Inc., 936 F.2d 640, 645 (2d Cir. 1991) ("We reverse because [the investor] did not object to the trades in writing within ten days of receiving his account statement *as he was bound to do under the customer agreement*." (emphasis added).) There is no evidence before the Court of any such writing requirement in this case, and it would have been Global Arena's burden to make any such production. The uncontradicted evidence of verbal complaints to Global Arena is therefore sufficient to defeat any ratification defense.

## 2. Global Arena is Unable to Meet Its Obligations as They Mature

The first prong of SIPA's four-part standard provides for the issuance of a protective decree if the Court finds that the debtor "is insolvent within the meaning of section 101 of Title 11, or is unable to meet its obligations as they mature." 15

14

U.S.C. § 78eee(b)(1)(A).[2] Although neither party cites to case
law interpreting the term "unable to meet its obligations as
they mature" in the SIPA context, the disjunctive use of the two
terms and the phrase's juxtaposition with the balance sheet-
based test used in 11 U.S.C. § 101(32)(A) (which defines
insolvency as the "condition such that the sum of [an] entity's
debts is greater than all of such entity's property"), indicates
that the term refers to the "equity test of insolvency." The
difference between the two tests has been described as follows:

> The equity test of insolvency equates insolvency with a
> lack of liquid funds, or the inability to pay one's debts
> in the ordinary course of business as the debts mature.
> This test normally has the lower threshold of
> compliance; it may be met by companies in temporary
> financial difficulty which are not on the verge of
> failure. The bankruptcy test of insolvency, on the other
> hand, focuses on the balance sheet of a company at
> discreet intervals of time in order to determine whether
> the company's liabilities exceed its assets; it will
> typically be met by companies in serious financial
> difficulty.

In re Poseidon Pool & Spa Recreational, Inc., 443 B.R. 271, 280
(E.D.N.Y. 2010) (quoting U.S. v. 58th St. Plaza Theatre, Inc.,
287 F. Supp. 475, 500 (S.D.N.Y. 1968)). Thus, even if the
precise amounts of Global Arena's assets and liabilities have

---

[2] Because there is no evidence before the Court regarding Global Arena's
current assets, if any, there is no basis to conclude that its financial
situation meets the definition of insolvency in 11 U.S.C. § 101(32)(A).

not been established, SIPC may obtain a protective decree if it can establish that the firm is equitably insolvent.

The facts adequately establish that Global Arena is unable to meet its obligations as they mature. Although multiple customers complained about unauthorized trading and the firm agreed to compensate them for their losses, it never actually did so.[3]  Similarly, Global Arena has not paid its New York State tax fine or the fine imposed by the State of Alaska for violations of its securities laws. There is also the matter of the $1.3 million fine imposed by FINRA. Although the Defendant correctly points out that the fine is unenforceable now that Global Arena is no longer a FINRA member, see Fiero v. FINRA, 660 F.3d 569, 577, 579 (2d Cir. 2011), it is nonetheless relevant because as long as that fine and its associated ban from FINRA membership are in place, Global Arena will be unable to generate revenue in the securities industry. See id. at 576 ("One cannot deal in securities with the public without being a member of FINRA."). With no evidence currently before the Court to indicate that Global Arena has reorganized itself in order to

---

[3] Although Global Arena's counsel represented at the hearing that it had agreed to settle the claims of Ronald Primuth for $75,000 (Tr. 96:6-10), that assertion has no weight because there is no evidence that the payment has actually been made or that Global Arena has the capital available to make it.

16

generate income from another line of business, and with ample evidence that the firm has failed to pay its obligations both large and small, the Court is left to conclude that Global Arena is equitably insolvent. The issuance of a protective decree is therefore required. See 15 U.S.C. § 78eee(b)(1).

## 3. Global Arena is Not in Compliance with Reporting Requirements

SIPC also contends that Global Arena has failed to comply with SEC rules related to financial responsibility, which would provide a separate basis for the issuance of a protective decree. See 15 U.S.C. § 78eee(b)(1)(C). The rule at issue in this case is SEC Rule 17a-5, which requires companies such as Global Arena to file FOCUS reports. See 17 C.F.R. § 240.17a-5(a). In this case, Global Arena filed its final FOCUS report on June 12, 2015, which showed its financial position as of May 31, 2015. (Corrao Dec. Ex. H.) Global Arena filed a form BDW on June 5, 2015, withdrawing its registration as a broker-dealer; it not file any further FOCUS reports, meaning that it never reported its financial status as of the date it withdrew. (See Corrao Dec. Ex. H.) SIPC contends that this failure to file violated a provision of Rule 17a-5 which requires broker-

17

dealers who are members of a national securities organization (such as FINRA) to file a FOCUS report within two business days of ceasing to be a member in good standing. See 17 C.F.R. § 240.17a-5(b)(1).

Global Arena contends, without citing to any authority outside of Rule 17a-5, that because that rule applies only to "every broker or dealer registered pursuant to section 15 of the [Securities Exchange] Act," its filing of the Form BDW on June 5, 2015 immediately took it outside of Rule 17a-5's ambit. (D.'s Post-Hearing Br., Dkt. No. 27, at 9.)  This argument is contradicted by SEC Rule 15b6-1 – the same rule that allows for withdrawal via filing Form BDW.  Under that rule, a withdrawal is only effective for the purposes of the relevant sections of SIPA approximately eight months after the filing of a form BDW. See 17 C.F.R. § 240.15b6-1(b) (withdrawal generally becomes effective 60 days after filing Form BDW); id. § 240.15b6-1(c) (withdrawal becomes effective for SIPA purposes six months after the date pursuant to subsection (b)).

Global Arena has contended that language on the Form BDW exempted it from filing FOCUS reports.  (Tr. 77:8-80:24, 126:17-127:3)  That language, which appears shortly after the point at which Global Arena indicated that it was filing a full

18

withdrawal of its registration, reads:

> If this is a full withdrawal and Item 5 is answered
> "yes", file with the CRD a FOCUS Report Part II (or Part
> IIA for non-carrying or non-clearing firms) "Statement
> of Financial Condition" and "Computation of Net Capital"
> sections. . . . The FOCUS Report and the statement of
> financial condition must reflect the finances of the
> firm no earlier than 10 days before this Form BDW Is
> filed.

(Corrao Dec. Ex. C.) Global Arena argued that because it filed

a FOCUS Report on June 12 (a week after its withdrawal (see

Corrao Dec. Ex. H.)) and because that report covered the

company's financial state through May 31 (less than ten days

before the Form BDW was filed (see id.)) Global Arena was not

required to make any further filings. However, there is no

language in that section to indicate that it represents the

totality of a firm's post-withdrawal filing obligations, nor

does Global Arena cite to any authority for the proposition that

this section of the withdrawal form would trump the provisions

of SEC Rules 17a-5 and 15b6-1.

Because Global Arena did not comply with important filing

rules related to financial responsibility, its failure provides

a second and independent basis for the issuance of a protective

decree. See 15 U.S.C. § 78eee(b)(1).

19

**Conclusion**

SIPC's application for a protective decree is granted. SIPC shall submit a proposed decree on notice naming a trustee and referring this matter to bankruptcy court.

It is so ordered.

New York, NY
February  11, 2016

ROBERT W. SWEET
U.S.D.J.